# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| **DEBRA NEVINS,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  7:23-cv-01037-RDP** |
| } | |
| **DCH HEALTH SYSTEMS, et al.,** } | |
| } | |
| **Defendants.** } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant DCH Health Systems' ("DCH") Motion for Summary Judgment (Doc. # 60) and Defendants Rebecca Boutwell ("Boutwell"), Felicia Ellison ("Ellison"), and Courtney Wingo's ("Wingo") Motion for Summary Judgment. (Doc. # 63). These Motions have been fully briefed and are ripe for a decision. (*See* Docs. # 61, 68, 72; 64, 69, 73). For the reasons discussed below, the Motions (Docs. # 60, 63) are due to be granted.

## I.      Background

In this case, Plaintiff Debra Nevins ("Plaintiff") has asserted claims of race discrimination, disability discrimination, racial harassment, retaliation, and defamation relating to the termination of her employment with DCH. (*See* Doc. # 46).

Plaintiff is an African American woman who worked at DCH for over thirty years – from 1989 until November 25, 2020. (Docs. # 65-5 at 88; 71-1 at 78; 65-1 ¶ 2). Plaintiff has Lupus. (Docs. # 61 ¶ 2; 68 ¶ 2). In 2020, she worked as a registrar (Doc. # 65-1 ¶ 2) and was supervised by Rodney Cannon ("Cannon") and Rachel Posey ("Posey"). (Doc. # 65-5 at 17). While at DCH, Plaintiff received at least two "star performance awards" or "shout-outs." (Doc. # 70-15 at 2, 5-6). "[Defendant] Ellison was the Director of Employee Health, [Defendant] Wingo was a Human

1

Resources Consultant, and [Defendant] Boutwell was Assistant Director of Patient Access." (Docs. # 64 ¶ 2; 69 ¶ 2).

### A.    The Flu Vaccine Policy

From 2016 to 2019, DCH's flu vaccine policy "strongly encourage[d]" all employees to get a flu vaccine but permitted them to "opt out of the influenza vaccination due to . . . personal preference." (Docs. # 64 ¶ 4; 65-6 at 3). Each year during this period, Plaintiff opted out of receiving the flu vaccine by submitting the declination form. (Docs. # 64 ¶ 5; 65-5 at 18, 74-75).

In 2020, DCH modified its flu vaccine policy, making receipt of the vaccine "mandatory each year unless a medical or religious belief exemption has been granted." (Doc. # 65-5 at 89). The Medical/Religious Exemption section of the 2020 policy stated:

> Exemption to immunization may be granted for medical contraindications after Employee Health receives appropriate proof. Ex: letter from primary care physician including medical contraindication[.]
>
> [. . .]
>
> If an employee requests a religious belief exemption, they must provide this in writing to Employee Health.

(Docs. # 61 ¶ 6; 68 ¶ 6; 65-5 at 89-90).

To obtain a religious exemption, employees had to submit "in writing" a specific form outlining the reason for their religious objection. (Docs. # 65-5 at 90, 97; 65-7 at 37-38). Failure to receive either the flu vaccine or an exemption by November 15, 2020 could "result in separation of the employee's employment." (Docs. # 65-1 ¶ 7; 65-5 at 91). Peggy Sease, Vice President of Human Resources ("HR") at DCH, testified that "[p]atient safety is very important to us. And for safety reasons for our patients, it's important that we were having our employees vaccinated." (Doc. # 71-22 at 25, 47).

2

Plaintiff requested a medical exemption on November 10, 2020 by submitting a note from Dr. Keisha Lowther that stated: "Mrs. Nevins[] has expressed a desire to refrain getting the influenza vaccine this season. She has been made aware of the risk of not getting inoculated and has voiced understanding." (Docs. # 65-1 ¶ 8; 65-5 at 94).

DCH denied Plaintiff's medical exemption request because an employee's desire to not be vaccinated was not a basis for exemption. (Doc. # 65-7 at 16). Ellison called Plaintiff to inform her about the denial. (Doc. # 65-5 at 22). Plaintiff perceived Ellison's tone as "so rude" (Doc. # 62-2 at 22); and later, Ellison was "still demanding that she was not going to accept my exemption." (*Id.* at 24).

Plaintiff contends that she submitted a second note from Dr. Lowther dated November 11, 2020 that stated: "Mrs. Nevins[] has expressed a desire to refrain getting the influenza vaccine this season. Mrs. Nevins[] has a history of Lupus. She has been made aware of the risk of not getting inoculated and has voiced understanding." (Docs. # 65-5 at 95; 61 ¶ 14; 64 ¶ 15).[1] Again, DCH did not accept Lupus as a contraindication for the flu vaccine. (Doc. # 65-7 at 18).

On November 16, 2020, Plaintiff's supervisor Posey told her (Plaintiff) that she could not continue working because she had neither received the flu vaccine nor an approved exemption by the deadline. (Doc. # 65-5 at 28). Plaintiff had Dr. Lowther submit the following note on November 19, 2020: "Please excuse Mrs. Nevins' participation in receiving the influenza vaccine this year. Patient is exempt for religious purposes." (*Id.* at 96). Peggy Sease stated that DCH denied this religious exemption request because it "failed to explain Plaintiff's sincerely held religious belief for declining the flu vaccine." (Doc. # 65-1 ¶ 10). Tina Skelton of Employee Health called Dr.

---

[1] DCH denies receiving this medical exemption request (Docs. # 61 ¶ 15; 64 ¶ 16) but clarifies its position. Even if it had received this exemption request it would have denied the request because "it does not constitute proof that Plaintiff has a medical contraindication to the flu vaccine. Lupus is not contraindicated to the flu vaccine." (Doc. # 65-1 ¶ 9).

Lowther to explain "that the religious exemption request had to be submitted by Plaintiff on DCH's religious exemption request form and had to describe Plaintiff's sincerely held religious belief." (Doc. # 65-9 ¶ 6).

As of November 19, 2020, Plaintiff had failed to receive either the flu vaccine or an exemption and Posey contacted her regarding her non-compliance. (Doc. # 65-10). On December 5, 2020, Wingo sent Plaintiff a letter confirming that her employment with DCH had been terminated effective November 25, 2020 "due to flu non-compliance." (Doc. # 65-5 at 98).

### B.    Harassment Allegations

At some point in or around 2019, Plaintiff complained to Boutwell about a "black face doll" that was left at her desk. (Doc. # 62-9 at 2). Boutwell testified that the item in question was a "blue, multicolored elephant" that a coworker brought back from Thailand. (*Id.*). Peggy Sease testified similarly. (Doc. # 62-4 at 56-57). One of Plaintiff's coworkers, P.W.,[2] testified that the item was a "Blackface doll hanging" from a "noose-type thing, and it was hanging on the [thumb tack]." (Doc. # 62-10 at 5, 12, 24). Boutwell told Plaintiff to "[j]ust throw it away." (*Id.* at 13).

Also in 2019, P.W. had a conversation with Plaintiff that was generally "about how [DCH has] a culture of . . . mistreating black people." (Doc. # 62-2 at 57). P.W. told Plaintiff that Boutwell made the following comments: "I smell hair burning," and "if I see someone with a hoodie . . . they are dead." (*Id.* at 55-56). Plaintiff testified that she perceived both comments as racial, in part "[b]ecause black people do press their hair." (*Id.*). To be clear, the dress code did not permit a registrar to wear a hoodie. (Doc. # 62-10 at 22).

When asked what Ellison had done to harass Plaintiff, Plaintiff stated that Ellison "kept demanding me to take the flu shot after I made it blatantly clear five years prior to that I don't take

---

[2] Although the parties differ on their treatment of non-party names, the court uses initials for certain deponents and other non-parties in the interest of preserving their privacy.

the flu vaccine." (*Id.* at 38-39). Plaintiff testified that Ellison had "stormed out of the [Employee Health] office into the hallway and almost attacked me with her words" by telling Plaintiff that she would not accept Plaintiff's vaccine exemption request. (*Id.* at 39).

When asked what Boutwell had done to harass Plaintiff, Plaintiff testified that in 2019 or 2020, Plaintiff had reported another employee who was not compliant with the DCH dress code. (*Id.* at 39-40). Boutwell told that employee that Plaintiff had reported her, and the employee confronted Plaintiff and used "threatening" body language. (*Id.*). Plaintiff further testified that Boutwell came in one morning and "locked herself in her office to eavesdrop on us." (*Id.* at 41-42). Plaintiff stated that "the whole atmosphere" felt like harassment. (*Id.* at 45).

Plaintiff also testified that at some point, "they moved me upstairs into a little area that nobody was at," and her supervisor Cannon "came in one morning and sat behind me with his legs crossed watching [] how fast I worked." (*Id.* at 40). Plaintiff testified that Cannon watched her for "over an hour" and was "threatening, crossing his legs." (*Id.* at 41). When asked whether there was "anything negative about that floor," Plaintiff responded, "I made it work for me," and explained that "[o]ne of the doctors gave me a refrigerator and I had a good little work area." (*Id.*).

P.W. testified that Cannon once made a comment that when he worked at Church's Chicken, one customer would come in and order "two titties and a leg." (Doc. # 62-10 at 9).

On March 25, 2020, Plaintiff was "brought [] into a meeting with HR," but was not warned that HR employee Wingo would be there. (Doc. # 65-5 at 43; Doc. # 62-15 at 13). Plaintiff believed that Cannon had invited Wingo to the meeting "to intimidate" Plaintiff. (Doc. # 65-5 at 43-44). Wingo testified that the meeting was to discuss why Plaintiff was not completing patient forms in a timely manner. (Doc. # 62-15 at 9).

In response to the question "[d]o you believe you had a target on your back?" Plaintiff answered, "I felt like it." (Doc. # 65-5 at 75). Plaintiff sent an email to Boutwell on April 3, 2020, stating:

> I am writing to request that management cease all forms of retaliation and discrimination against me. On several occasions, I have been retaliated against by management. It has been a continuation of continued harassment and retaliation that I have been subjected to for several years. My qualifications and demonstrated commitment to this organization has been me[t] with retaliation and discrimination. I have been denied Promotions and treated inferior than others, which is against company policy. Again, I am requesting that I not be singled out and treated differently in the future based on discrimination and retaliation.

(*Id.* at 142).

On April 9, 2020, Plaintiff discussed "the issues that [were] going on" with Boutwell and Cannon in a meeting with Wingo and Keri Hindman. (Doc. # 62-2 at 47-50).

After Plaintiff was terminated, she was approved for unemployment benefits, but after the appeal period had lapsed, DCH attempted to appeal this approval. (Docs. # 68 at 23; 69 at 26).

### C.    Comparators

T.W. was a white registrar at DCH who received a religious exemption to the COVID vaccine. (Docs. # 62-14 at 5, 7; 71-22 at 156; 71-31 at 37). T.W. has never been disciplined at DCH. (Doc. # 62-14 at 11). T.W.'s exemption request stated: "[t]he vaccine goes against my belief as a Christian because I believe it goes against God's Word and Scriptures." (*Id.* at 18). On an attached page, T.W. cited Bible verses and explained how those verses related to her objection to the COVID vaccine. (*Id.* at 19). T.W. showed the exemption request to her manager Posey, who advised T.W. to turn it into Employee Health. (*Id.* at 8; Doc. # 71-31 at 39-41).

### D.    EEOC Charges

During the course of her employment, Plaintiff has filed two EEOC charges – one over a decade ago, and the other related to this lawsuit. Plaintiff filed an EEOC charge in November 2014

6

alleging DCH discriminated against her based on her race by denying her a promotion to the Patient Liaison position in April 2014. (Doc. # 65-5 at 88). The EEOC dismissed the charge as untimely. (Doc. # 65-1 ¶ 3).

Plaintiff filed a second EEOC charge on March 25, 2021. (Doc. # 65-5 at 139). In the charge, Plaintiff alleges her termination from DCH was (1) in retaliation for her 2014 EEOC charge and her April 2020 email to management and (2) based on her race and disability. (*Id.* at 139).

### E.    Allegedly Defamatory Statements

In her Fourth Supplemented Response to Interrogatories, Plaintiff identified five allegedly defamatory statements. First, she referenced a statement between Ellison and either Boutwell or Posey that "'she' (Plaintiff) was not in compliance for whatever reason they [F.E.; R.B. and C.W.] 'so declared.'" (Doc. # 62-18 at 3). Plaintiff contended that the statement was made to the EEOC and the State of Alabama Department of Labor, and that it was untrue because the rejection of this request "was not due to the 'lack of specificity' of the request." (*Id.*). Second, Plaintiff highlighted a statement in a letter to the EEOC under the heading "Charging Party's Refusal to Receive Vaccination or Provide Exemption Information." (*Id.*). Third, Plaintiff included a position statement that DCH provided to the EEOC "which intentionally misrepresented Plaintiff's compliance with DCH's flu vaccine revised policy." (*Id.*). Plaintiff listed written statements to the EEOC titled "Timeline of Attempted Contact" that assert Posey and Wingo tried to call Plaintiff on November 16, 2020 and November 24, 2020. (*Id.* at 3-4). Fourth, Plaintiff identified a letter that DCH submitted to the EEOC that stated "[t]hat the plaintiff did not provide a second medical exemption request for the flu vaccine on November 11, 2020, but instead presented her first request for exemption which was dated November 4, 2020." (*Id.* at 4). Fifth, Plaintiff pointed out DCH's

statement to the Alabama Department of Labor that "Plaintiff was discharged for violation of company policy." (*Id.*).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."

*Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

### III.   Analysis

In her complaint, Plaintiff brings the following claims: (1) Wrongful Termination against all Defendants (Count I); (2) Racial Discrimination against DCH, Ellison, and Boutwell (Count II); (3) Disability Discrimination against all Defendants (Count III); (4) Racial Harassment – hostile work environment – against DCH, Ellison, and Boutwell (Count IV); (5) Retaliation against all Defendants (Count V); and (6) Defamation/Slander Per Quod against all Defendants (Count VI). (Doc. # 46). The Defendants have moved for summary judgment on all claims brought against them. (*See* Docs. # 60, 63). The court considers each claim, in turn.

### A.   Wrongful Termination under Title VII (Count I) and Race Discrimination under 42 U.S.C. § 1981 (Count II)

"[E]mployers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015). However, under Title VII and § 1981, an employer cannot fire an employee based on a protected classification. Title VII prohibits discrimination based on "race, color, religion, sex or national origin," 42 U.S.C. § 2000e-2(a)(1), and § 1981 prohibits "intentional race discrimination." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).

Plaintiff's complaint asserts discrimination claims under both § 1981 and Title VII. (*See* Doc. # 46). Section 1981 discrimination can only be established under a single-motive theory – showing racial discrimination was the *only* (*i.e.*, but-for) cause of the adverse employment action. *See Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 (11th Cir. 2023). In contrast, Title VII discrimination can be established under a mixed-motive theory – that is, by showing discrimination was one of many "motivating factors" in the adverse employment action. 42 U.S.C. § 2000e-2(m). For obvious reasons, the Eleventh Circuit has described the former as a higher standard for causation. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943 (11th Cir. 2023) (citing *Comcast*

*Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 336-41 (2020)). Like Plaintiff here, the employment-discrimination plaintiff in *Flowers* brought claims under both § 1981 and Title VII. *Flowers*, 803 F.3d at 1333. In *Flowers*, the Eleventh Circuit found the plaintiff's § 1981 claim "r[ose] and f[ell] with his Title VII" claim. *Id.* at 1335 n.7. Similarly, here, Plaintiff's § 1981 claim falls with her Title VII claim.

Plaintiff has asserted a claim for "wrongful termination in violation of Title VII" against all Defendants (Count I) as well as "racial discrimination, 42 U.S.C. § 1981" against DCH, Ellison, and Boutwell (Count II). (Doc. # 46 at 9-13). As part of her wrongful termination claim, Plaintiff lists theories related to retaliation (*id.* ¶ 94), race, medical condition, and gender. (*Id.* ¶ 100). The court separately considers Plaintiff's retaliation claim with the retaliation claim in Count V. Plaintiff cannot pursue Title VII claims in Count I "on the basis of . . . gender" because Plaintiff did not raise this claim in her March 25, 2021 EEOC charge. (*See* Doc. # 46 ¶ 100). This means that the gender discrimination claim is unexhausted, and therefore, barred. *See Gregory v. Ga. Dep't Hum. Res.*, 355 F.3d 1277, 1279-80 (11th Cir. 2004). Similarly, Plaintiff can only pursue a *race*-related discrimination claim under § 1981. *Ferrill*, 168 F.3d at 472. And, neither § 1981 nor Title VII protect against discrimination based on a medical condition, so the court here only considers Plaintiff's race discrimination claim.

After careful review, the court concludes that Plaintiff's claims for race discrimination cannot survive summary judgment. First, Title VII does not allow for individual liability. Second, Plaintiff has not established a prima facie case of race discrimination under *McDonnell Douglas*. Third, even if she did establish a prima facie case of race discrimination, Plaintiff has not shown that DCH's explanation for her termination was pretextual. Finally, Plaintiff has not explained how the Rule 56 record demonstrates a convincing mosaic of race discrimination. Because Plaintiff has

failed to carry her burden under Rule 56 of showing that there are genuine issues of material fact as to her race discrimination claims, Defendants are entitled to summary judgment on both claims.

### 1.    Individual Liability Under Title VII

The individual Defendants – Ellison, Boutwell, and Wingo – are entitled to summary judgment on Count I because Title VII does not give rise to individual liability. *See Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) (holding that "relief under Title VII is available against only the employer and not against individual employees"). Plaintiff concedes this. (Doc. # 69 at 11-12). Therefore, the individual Defendants (Ellison, Boutwell, and Wingo) are due to be dismissed from Count I.

### 2.    Prima Facie Race Discrimination Claim

"When direct evidence of unlawful discrimination is lacking," some courts utilize the *McDonnell Douglas* "burden-shifting framework" to establish intentional discrimination with circumstantial evidence. *Flowers*, 803 F.3d at 1335 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, the employee first must show a prima facie case of discrimination. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1237 (11th Cir. 2016) (citing *McDonnell Douglas*, 411 U.S. at 802). Then, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. Once the employer has done that, the employee's job is to demonstrate that the employer's proffered reason was, in fact, merely pretext for the employer's acts. *Id*.

The Eleventh Circuit has explained that to establish a prima facie case of race discrimination, an employee must show that: "(1) she belonged to a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified to perform the job in question,

[and] (4) her employer treated similarly situated employees outside her class more favorably." *Phillips*, 87 F.4th at 1321 (internal quotations marks omitted).

Plaintiff's prima facie case fails at the fourth step. It is undisputed that Plaintiff belongs to a protected class – race (Docs. # 65-5 at 88; 71-1 at 78; 65-1 ¶ 2), that she was subjected to an adverse employment action – termination (Doc. # 65-5 at 98), and that Plaintiff was qualified for her position. (*See* Docs. # 61, 64 (not disputing this)). But, Plaintiff cannot demonstrate that her employer treated similarly situated employees outside her class more favorably.

A comparator employee must be "similarly situated in all material respects" to the plaintiff. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc) (*Lewis I*). The Eleventh Circuit has outlined the following "guideposts": "[o]rdinarily, for instance, a similarly situated comparator – " (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff," (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff," (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff . . . and" (4) "will share the plaintiff's employment or disciplinary history." *Id*. at 1227-28.

Plaintiff argues T.W., a white DCH employee, was similarly situated to Plaintiff but received different treatment when DCH granted her religious exemption request. (Doc. # 69 at 22).[3] In particular, Plaintiff argues that T.W. received differential treatment because Posey helped her submit the exemption request and T.W.'s exemption request was granted. (*Id.* at 21-22).

After careful review, the court concludes that Plaintiff and T.W. were not similarly situated in all material respects because they engaged in different conduct – the first *Lewis I* "guidepost[]." *Lewis I*, 918 F.3d at 1227. Plaintiff's religious exemption request varied drastically from T.W.'s,

---

[3] Although Plaintiff mentions other employees, such as Dr. Givhan and Peggy Yeatman, she concedes that they are "not [] similarly situated in all material respects to the Plaintiff." (Doc. # 69 at 22).

as it was sent from her doctor and merely stated that Plaintiff was "exempt for religious purposes." (Doc. # 65-5 at 96). Further, it was only sent after two requests for exemption, which did not reference any religious objections, were submitted and not approved. (Docs. # 65-1 ¶ 8; 65-5 at 94-95; 61 ¶¶ 14-15). In contrast, T.W. submitted her own religious exemption request, and the request explained in detail what her religious beliefs are and how those beliefs are connected to her objection to the vaccine. (Doc. # 70-31 at 3-4). For example, T.W.'s exemption request stated that "[t]he vaccine goes against my belief as a Christian because I believe it goes against God's Word and Scriptures." (Doc. # 62-14 at 18). On an attached page, T.W. cited several Bible verses and explained how she believed that those verses related to her objection to receiving the COVID vaccine. (*Id.* at 19).

Plaintiff characterizes T.W.'s request as containing "adlibbed and inaccurate bible verses," but Plaintiff does not (and, indeed, cannot) challenge the fact that T.W.'s request contained a profession of a religious belief and an explanation of its connection with her vaccine objection. (Doc. # 69 at 22). And, although Plaintiff argues that Posey helped T.W., Posey merely advised T.W. to turn the request into Employee Health. (Docs. # 62-14 at 8, 18-19; 71-31 at 39-41). It is not clear to the court how informing T.W. about where to send her request was more favorable (discriminatory) treatment, especially given that there is no contention that Plaintiff did not know where to send her request.

While other *Lewis I* guideposts may point to similarities between T.W. and Plaintiff – *e.g.*, they were subject to the same policy,[4] under the same supervisor (Doc. # 61 at 18-19), and shared a similar disciplinary history (Doc. # 69 at 22; 62-14 at 11) – *Lewis I* does not present these

---

[4] Although T.W.'s request was for an exemption from the COVID vaccine, while Plaintiff's request was for an exemption from the flu vaccine, both exemption requests were made after the 2020 DCH vaccine exemption policy was enacted. (Docs. # 62-14 at 5, 7, 18; 71-22 at 156; 71-31 at 37).

guideposts as part of a balancing test. Rather, *Lewis I* lists the factors in the disjunctive. The court envisions that an employer might "accord different treatment to employees . . . who engaged in different conduct, who were subject to different policies, *or* who have different work histories." *Lewis I*, 918 F.3d at 1228 (emphasis added). To be sure, the "or" indicates that any one of these "guideposts" could disqualify a proffered comparator. Because Plaintiff's conduct differed materially from T.W.'s, T.W. is not a valid comparator, and Plaintiff has failed to establish a prima facie case of race discrimination.

### 3. Rebutting Legitimate, Non-discriminatory Reason as Pretextual

Even if Plaintiff had established a prima facie case (and, to be clear, she has not), she has not successfully rebutted Defendants' legitimate, non-discriminatory reason for her termination. That reason is that "Plaintiff failed to comply with DCH's 2020 flu vaccine policy, and DCH terminated Plaintiff's employment pursuant to that policy." (Doc. # 61 at 29).

If an employee does not comply with their employer's vaccination policy (particularly if the employer is in healthcare), that employer could be legitimately motivated to terminate the non-complying employee. *See Biden v. Missouri*, 595 U.S. 87, 95 (2022) (per curiam) ("Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, *influenza*, and measles, mumps, and rubella.") (emphasis added). Indeed, Peggy Sease testified that "[p]atient safety is very important to us. And for safety reasons for our patients, it's important that we were having our employees vaccinated." (Doc. # 71-22 at 47).

If the employer satisfies its burden by articulating a legitimate, non-discriminatory reason for termination, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to show that the reason given by the employer is pretext for illegal discrimination. *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). "To establish pretext, an

employee must 'cast sufficient doubt on the [employer's] proffered nondiscriminatory reasons'"
for the adverse employment action "by demonstrating 'such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for
its action that a reasonable factfinder could find them unworthy of credence.'" *Phillips*, 87 F.4th
at 1323-24 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

Plaintiff argues Defendants' non-discriminatory reason was pretextual because DCH had
previously allowed her to refuse the flu vaccine. (Docs. # 68 at 12-13; 69 at 13-14, 16). Plaintiff
also states that she had repeatedly notified Defendants that she had Lupus and that "she was
concerned about getting sick after receiving the vaccine" (Docs. # 68 at 13; 69 at 16-17). Finally,
Plaintiff implies that DCH's rejection of her religious exemption request was discriminatory
because DCH had granted T.W.'s request. (Docs. # 68 at 18-19; 69 at 21). She also states that
"their legitimate non-discriminatory justification does not make sense. The Plaintiff testified [in
her deposition] that she is a Christian." (Doc. # 68 at 18). None of these arguments suggest pretext.

First, Plaintiff's exemption requests were non-compliant because her religious exemption
request did not identify a religious belief or explain how that belief was linked to her opposition
to the flu vaccine. Indeed, the first two requests did not even mention any religious belief. DCH
policy stated: "If an employee requests a religious belief exemption, they must provide this in
writing to Employee Health." (Docs. # 61 ¶ 6; 68 ¶ 6; 65-5 at 89-90). To be "in writing," employees
had to fill out a form outlining their religious objection. (Docs. # 65-5 at 90, 97; 65-7 at 37-38).
Plaintiff did not do so. Her religious exemption request was a note from her doctor stating: "Please
excuse Mrs. Nevins' participation in receiving the influenza vaccine this year. Patient is exempt
for religious purposes." (Doc. # 65-5 at 96). Even if Plaintiff had filled out the required form with
this information, it still would not explain what Plaintiff's religious belief against the flu vaccine

was. This was not a secret withheld from Plaintiff – Tina Skelton of Employee Health called Plaintiff's doctor after receiving this request, explaining "that the religious exemption request had to be submitted by Plaintiff on DCH's religious exemption request form and had to describe Plaintiff's sincerely held religious belief." (Doc. # 65-9 ¶ 6). Plaintiff never complied with that policy.

Second, Plaintiff's medical exemption requests were non-compliant because they did not identify any medical contraindications. The 2020 policy required "appropriate proof" of "medical contraindications." (Docs. # 61 ¶ 6; 68 ¶ 6; 65-5 at 89-90). Plaintiff's first medical exemption request did not identify any medical condition, describing only Plaintiff's "*desire to refrain getting the influenza vaccine this season.*" (Doc. # 65-5 at 94) (emphasis added). Plaintiff's second medical exemption request added: "Mrs. Nevins[] has a history of Lupus." (*Id.* at 95). However, DCH did not accept Lupus as a contraindication for the flu vaccine. (Doc. # 65-7 at 18). The phrasing of the note suggests that Plaintiff's doctor did not accept Lupus as a contraindication either, as it describes the "risk of *not* getting inoculated." (Doc. # 65-5 at 94-95) (emphasis added).

Finally, the court cannot discern any argument made by Plaintiff indicating that the Rule 56 record suggests the real reason that her two medical exemption requests were denied was because of her race. (*See* Docs. # 68, 69). And regarding Plaintiff's argument that DCH's rejection of her religious exemption was discriminatory in favor of the comparator T.W., the court has already rejected this argument. T.W. is not a valid comparator. Further, Plaintiff has not come close to rebutting Defendants' legitimate, non-discriminatory reason for terminating her.

### 4.    Convincing Mosaic Theory

Plaintiff states in an introduction that her "evidence will demonstrate a convincing mosaic or circumstantial evidence [from] which a jury may infer that the Plaintiff was discriminated

against and because of her race." (Doc. # 69 at 5; *see also* Doc. # 68 at 4 (similar)). But, Plaintiff's convincing mosaic discussion is limited to her harassment claim. (Docs. # 68 at 21; 69 at 23).

Even if Plaintiff had briefed this theory related to her claim of race discrimination, the Rule 56 record does not provide any support for her argument. A plaintiff may overcome a summary judgment motion using the "convincing mosaic theory" when she presents sufficient circumstantial evidence that would allow "a reasonable factfinder to infer intentional discrimination in an employment action – the ultimate inquiry in a discrimination lawsuit." *Tynes*, 88 F.4th at 946; *see also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "That evidentiary picture may include, 'among other things.' (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023) (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*)).

The Rule 56 record suggests none of those elements and does not in any way paint a picture of race discrimination. Plaintiff has not pointed to any pieces of evidence that, when viewed together, raise an inference of discrimination. Even under the mosaic framework, Plaintiff's race discrimination claim fails.

**B.    Disability Discrimination under 42 U.S.C. § 1981 (or the Americans with Disabilities Act) (Count III)**

In her complaint, Plaintiff describes Count III as a claim for disability discrimination under 42 U.S.C. § 1981. (Doc. # 46 at 13). But § 1981 only prohibits discrimination based on race. *See Ferrill*, 168 F.3d at 472. In her response to Defendants' motion for summary judgment, Plaintiff recharacterizes Count III as arising under the Americans with Disabilities Act ("ADA"), which prohibits discrimination based on disability. (Doc. # 68 at 19). But, "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates,*

*McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Therefore, because there is no disability discrimination claim under § 1981, Defendants are entitled to summary judgment on Count III.

Even construing Plaintiff's claim in Count III as if it had been brought under the ADA, it would still fail. A claim for disability discrimination under the ADA requires evidence that the plaintiff "(1) is disabled, (2) is a 'qualified individual,' and (3) was discriminated against because of h[er] disability." *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023) (citations removed).

Plaintiff alleges that her Lupus condition barred her from being inoculated with the flu vaccine and that Defendants' termination of her for failure to receive the vaccine constituted disability discrimination. (Doc. # 68 at 19). As an initial matter, the court notes that Plaintiff has not alleged that she is disabled (*see* Doc. # 46 ¶¶ 126-80), but instead she describes her Lupus as a "diagnosis" (*id.* ¶¶ 129-31, 139, 173), a "medical condition" (*id.* ¶ 138), or a "medical contradiction." (*Id.* ¶¶ 159, 161, 169). So, Plaintiff has not satisfied the minimal requirements for a disability discrimination claim under the ADA. And there are additional reasons why Plaintiff has failed to state a claim under the ADA. The court addresses those below.

### 1.    Individual Liability Under the ADA

An ADA does not give rise to a claim for individual liability. *See Albra v. Advan, Inc.*, 490 F.3d 826, 830 (11th Cir. 2007). Plaintiff concedes this. (Doc. # 69 at 22-23). Therefore, the individual Defendants – Ellison, Boutwell, and Wingo – are entitled to summary judgment on the claim in Count III.

### 2.    Failure to Provide Reasonable Accommodation

DCH is entitled to summary judgment on Count III because Plaintiff has not presented any evidence that DCH did not provide her a reasonable accommodation for her Lupus. The ADA

defines "reasonable accommodation" as "appropriate adjustment or modifications of examinations, training materials or policies." 42 U.S.C. § 12111(9). But "an employer is not required to accommodate an employee in any manner that the employee desires – or even provide that employee's preferred accommodation." *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020).

Plaintiff wanted DCH to accommodate her Lupus by allowing her to self-exempt from receiving the flu vaccine. While it no longer allowed employees to simply elect not to receive the flu vaccine, DCH's 2020 policy still provided a "reasonable accommodation" in the form of a medical or religious exemption. (Doc. # 62-2 at 89). As discussed at length above, Plaintiff's medical and religious exemption requests were denied because they did not comply with DCH's requirements. While requiring Plaintiff to provide documentation of a medical contraindication or religious belief was not the accommodation Plaintiff wanted, it was reasonable and satisfied the ADA. Thus, Defendants are entitled to summary judgment as to Count III.

## C.    Harassment under 42 U.S.C. § 1981 (or Title VII) (Count IV)

Count IV of Plaintiff's complaint purports to assert a harassment claim under § 1981. Plaintiff complains she was harassed "for making complaints about or opposing conduct [§ 1981] prohibits" (Doc. # 46 ¶ 182), and because of her race (*id.* ¶ 184) and disability. (*Id.* ¶ 185). Section 1981 only covers claims for *racial* harassment. *See Ferrill*, 168 F.3d at 472. In her response to the motion for summary judgment, Plaintiff clarifies that her claim is one for only *racial* harassment through a hostile work environment and she seeks to clarify that her claim is brought under *both* Title VII & § 1981. (Docs. # 69 at 23, 28; 68 at 21, 25). Again, "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour*, 382 F.3d at 1315.

However, there are other reasons her claims – whether based on § 1981 or Title VII – fail. For completeness, the court evaluates her harassment claim under both statutory frameworks.

### 1.    Racially Hostile Work Environment Claim

Section 1981 prohibits racial discrimination in employment contracts, *Ferrill*, 168 F.3d at 472, and that prohibition includes workplace harassment that creates a racially hostile work environment. *See, e.g.*, *Yelling*, 82 F.4th at 1329. "To succeed on a racially hostile work environment claim under [] § 1981 [or Title VII], [a plaintiff] must prove (1) she belongs to a protected class, (2) she experienced unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment, [and] (5) employer responsibility under a theory of vicarious or direct liability." *Id*. at 1334. Harassment under § 1981 must have been "caused by [racial] discrimination, such as that similarly situated white employees were treated differently." *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1304 (11th Cir. 2023).

It is not clear which specific instances Plaintiff contends constitute a racially hostile work environment. Plaintiff's complaint and briefing contain a variety of incidents that Plaintiff does not connect to race, that Plaintiff did not personally hear or observe, and that did not apply only to Plaintiff. As best the court can tell, Plaintiff's harassment allegations are based on the following alleged incidents:

- What appeared to be a blackface doll was hanging on a "noose-type thing" from a thumb tack at Plaintiff's desk in or around 2019. (Docs. # 62-9 at 2; 62-10 at 12).[5]
- Outside of Plaintiff's presence, Boutwell made the following comments: "I smell hair burning," and "if I see someone with a hoodie . . . they are dead." (Doc. # 62-2 at 55-56).

---

[5] Although it is disputed whether the object in question was an elephant or a blackface doll, *compare* (Docs. # 62-9 at 2; 62-4 at 56-57 (testimony that it was an elephant)), *with* (Docs. # 62-9 at 2; 62-1 at 5, 12, 24 (testimony that it was a blackface doll)), all reasonable doubts and all justifiable inferences about the facts are resolved in favor of the non-movant. *See Allen*, 405 F.3d at 1314; *Fitzpatrick*, 2 F.3d at 1115. Therefore, the court assumes for the purposes of summary judgment analysis that Plaintiff is correct that the object was a blackface doll.

- Ellison repeatedly demanded that Plaintiff get a flu shot. (*Id.* at 38-39).
- Boutwell told an employee that Plaintiff had reported the employee for being in violation of the DCH dress code, and the employee later confronted Plaintiff and used "threatening" body language. (*Id.* at 39-40).
- Boutwell "locked herself in her office to eavesdrop on" Plaintiff and her co-workers one morning. (*Id.* at 41-42).
- Plaintiff was moved upstairs where "nobody was at," although she "made it work" and described it as "a good little work area" with a refrigerator. (*Id.* at 41).
- Cannon "came in one morning and sat behind [Plaintiff] with his legs crossed watching [] how fast [Plaintiff] worked." (*Id.*).
- Plaintiff was told to attend a meeting about why she was not completing patient forms in a timely manner, but Plaintiff was not warned beforehand that Wingo would be there. (*Id.* at 43; Doc. # 62-15 at 9).
- Plaintiff stated in an email: "I have been denied Promotions and treated inferior than others." (Doc. # 65-5 at 142).[6]
- P.W. testified that Cannon made a comment that when he worked at Church's Chicken, one customer would come in and order "two titties and a leg." (Doc. # 62-10 at 9).
- Plaintiff was terminated for failure to comply with DCH's flu vaccine policy. (Doc. # 62-2 at 42-43).
- DCH attempted to appeal Plaintiff's approval of unemployment benefits after the appeal time had lapsed. (Docs. # 68 at 23; 69 at 26).

With these assertions in mind, the court addresses Plaintiff's harassment claim.

### a.    Protected Class

Plaintiff satisfies the first element of a hostile work environment claim. She belongs to a protected class. (Docs. # 65-5 at 88; 71-1 at 78; 65-1 ¶ 2).

### b.    Unwelcome Harassment

The court assumes Plaintiff also satisfies the second element because the Rule 56 record includes her testimony that she experienced what she perceived as harassment and that it was unwelcome. (*See, e.g.*, Docs. # 62-2 at 57 (Plaintiff talked with P.W. about DCH's "culture" of "mistreating black people"), 39-40 (Boutwell told another employee that Plaintiff reported her for

---

[6] As it relates to Title VII, the only promotion that the Rule 56 record shows Plaintiff was denied is one from her 2014 EEOC charge, which is clearly untimely. (Docs. # 65-5 at 88; 65-1 ¶ 3).

violation of the dress code), 45 (Plaintiff testified that "the whole atmosphere" of DCH felt like harassment)).

### c.    Based on Race

The court assumes Plaintiff satisfies the third element, but only with respect to the blackface incident and the comments about hair burning and wearing a hoodie. The blackface incident is based on race for obvious reasons. *See, e.g.*, *Pyatt v. AECOM Tech. Servs.*, 2019 WL 13256820, at *4 (S.D. Fla. Dec. 2, 2019) (discussing blackface as evidence of race discrimination); *Kline v. Atlanta Hawks, LLC*, 2020 WL 13653829, at *23-24 (N.D. Gal. Jan. 22, 2020) (similar). And, regarding Boutwell's comments about hair burning and wearing a hoodie, Plaintiff testified that she perceived them as racial. (Doc. # 62-2 at 55-56).

### i.    Skepticism about Boutwell's Comments

There may be some question as to whether using a hot hair tool and wearing a hoodie is behavior that is so limited to one race that mentioning it is inherently racially discriminatory. Additionally, it is not outside the realm of possibilities that a comment about wearing hoodies at DCH could be linked to the non-racial topic of compliance with the DCH dress code. (*See* Doc. # 62-10 at 22 (registrars were not permitted to wear a hoodie under the dress code)). In *Yelling*, for example, the Eleventh Circuit noted that comments about former President Obama were "not inherently racial" even when they used words like "stupid," the "worst," or a "piece of s***" in describing the former President. 82 F.4th at 1336. As in *Yelling*, even though hair burning or wearing hoodies could be linked to race, that does not mean that negative comments about these behaviors are inherently racial. The Eleventh Circuit in *Yelling* also rejected the plaintiff's contention that coworkers' comments about being "confederate flag flyers" were race-based because the plaintiff had not explained anything beyond "generalizations about changing 'societal

norms.'" *Id.* Similarly, here, Plaintiff has not offered any explanation of why Boutwell's comments are racial beyond asserting that Black people "do press their hair." (Doc. # 62-2 at 55). It also is of note that these comments were not even made to Plaintiff. Rather, a coworker told Plaintiff about these comments. Although it is theoretically possible for a hostile work environment to be predicated on comments made out of a plaintiff's earshot, *see Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014), this detail adds to the court's skepticism. However, resolving all justifiable inferences in favor of the non-movant, the court assumes that Boutwell's comments were racial in nature.

### ii.        Denied 2014 Promotion

The 2014 promotion denial cannot be part of this claim because it is clearly untimely. *See Fortson v. Carlson*, 618 F. App'x 601, 605 (11th Cir. 2015). Although hostile work environment claims can be based on untimely incidents if they are sufficiently related to timely incidents, Plaintiff has failed to show that the promotion denial nearly a decade ago is sufficiently related to the blackface doll and Boutwell's two comments such that they form part of a continuing hostile work environment. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)). "The pivotal question is whether the timely discrete acts are sufficiently related to the hostile work environment claim." *Chambless v. Louisiana-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007).

Even putting aside the substantial temporal gap between the events, to be sufficiently related, the circumstances surrounding the promotion denial must "suggest that [that] discrete act[] w[as] the same type of 'discriminatory intimidation, ridicule, and insult' that characterized the

24

untimely allegations." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Characteristics that make actions of the "same type" include whether they were similar kinds of actions, whether this specific type of conduct was repeated, and whether the same individuals engaged in the conduct. *Morgan*, 536 U.S. at 120-21.

Both law and logic make clear that a promotion denial is a different type of discrimination action than the presence of a blackface doll, a comment about smelling burnt hair, or a comment about hoodies. While the denial of a promotion is an official employment-related action, the three timely incidents did not concern Plaintiff's job title, pay, or employment status. The denied promotion was not repeated conduct. And it is not clear whether the same individuals engaged in the conduct, as there is no evidence of who put the blackface doll on Plaintiff's desk, and there is no evidence that Boutwell was involved in the 2014 denied promotion. Therefore, the untimely 2014 denied promotion is not sufficiently related to the timely incidents to be considered in this claim.

### iii.        Other Non-Racial Incidents

The court also does not consider the other incidents Plaintiff complains about – such as Plaintiff's workspace being moved, her vaccine exemption requests being repeatedly denied, her being called into a meeting without a warning that an HR employee would be there, or her hearing about the "two titties and a leg" comment – racial in nature. Plaintiff has not come close to explaining how these incidents are in any way related to her race.

### d.        Sufficiently Severe or Pervasive to Alter Terms of Employment

After the analysis detailed above, what remains are Plaintiff's claims about the blackface incident and the two comments allegedly made by Boutwell. The court concludes with respect to these claims that Plaintiff has failed to satisfy the fourth element – that the harassment was

sufficiently severe or pervasive to alter the terms of her employment. This element requires a plaintiff to show the "work environment was both subjectively and objectively hostile." *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1285 (11th Cir. 2018) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)). This severe or pervasive element "often tests the legitimacy of most harassment claims." *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 56 (11th Cir. 2005) (citing *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000)). To determine whether an environment is objectively hostile, courts "look[] at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Forklift Sys., Inc.*, 510 U.S. at 23.

Finding a blackface doll hanging by a noose at one's desk is both offensive and distressing, and it is an understatement to say that such an object has no place in a civilized society, much less a workplace. But as the Rule 56 record makes clear, here it was an isolated incident, and therefore it was not pervasive. Although a single but horrific incident can in certain cases create a hostile work environment, that incident must be sufficiently and objectively severe. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (conduct must be severe or pervasive). As the Eleventh Circuit has noted, "[i]solated or sporadic incidents of harassment are not objectively severe or pervasive enough to alter the terms or conditions of employment." *Shine v. Univ. of Ala. – Birmingham*, 2023 WL 1099766, at *3 (11th Cir. Jan. 30, 2023) (per curiam). In *Shine*, the Eleventh Circuit affirmed a grant of summary judgment to dismiss a plaintiff's racially hostile work environment claim predicated on a "gun incident" in which a "white employee pulled up his shirt to reveal a loaded handgun in [one of the plaintiffs'] presence. The employee did not point the handgun at [one of the plaintiffs], and [that plaintiff] could not recall what the employee

said at that time." *Id.* The panel noted that, although the presence of a gun "weighs heavily on the severity factor, a single incident absent any allegation of threat, interference with job performance, or repetition is not enough to meet the criteria of objective severity." *Id.*

Similarly, here, the blackface incident was not sufficiently severe. This is particularly so because (unlike a gun), there is no evidence that the doll itself was physically threatening,[7] particularly given that it was immediately thrown away. (Doc. # 62-10 at 13). There is also no evidence that it interfered with – much less unreasonably interfered with – Plaintiff's job performance. In fact, despite this incident, Plaintiff received at least two "star performance awards" or "shout-outs" while working at DCH. (Doc. # 70-15 at 2, 5-6). Although she was terminated, it was for noncompliance with DCH's vaccine requirements – not bad job performance.

Turning to Boutwell's comments about hair burning and someone in a hoodie being "dead," the evidence demonstrates that, even if made, they were non-severe and isolated. The Eleventh Circuit has held that to succeed at trial on a racially hostile work environment claim predicated on "racial slurs," those slurs "had to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'" *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)). Even interpreting Boutwell's two comments as racial slurs, they were not commonplace, overt, or denigrating – much less *so* commonplace, overt, or denigrating that they created an atmosphere charged with racial hostility. Boutwell's two comments were not physically threatening or humiliating. Plaintiff was not even in the room when Boutwell made these comments. "[O]verhearing offensive comments is less severe or humiliating than being the

---

[7] There is also evidence suggesting that the alleged "black face doll" was a multicolored elephant from Thailand. (Docs. # 62-4 at 56-57; 62-9 at 2).

intended target of direct harassment." *Yelling*, 82 F.4th at 1336; *see also Small v. City of Hollywood*, 661 F. Supp. 3d 1187, 1201 (S.D. Fla. 2023) (noting that a "comment regarding 'Jamaicans' was made outside of [the plaintiff's] presence and, consequently, as also not directed at [the plaintiff]"). And, the severity of the remarks is even more attenuated given that Plaintiff heard of these remarks via hearsay. Further, it is not clear how Plaintiff could have felt personally targeted by the hoodie comment, as registrars were not allowed to wear a hoodie at work and she never testified that she did so. (Doc. # 62-10 at 22). As already noted, there is no evidence that these comments unreasonably interfered with Plaintiff's job performance. And while a work environment with *daily* racist comments could be hostile, *see Smelter*, 904 F.3d at 1285-86 (finding a hostile work environment when the employee heard racist comments every day of her two-month employment including a coworker calling her a "dumb black n**"), Boutwell's comments were nothing close to daily. She is only alleged to have made two.

Examining the totality of these circumstances, this case resembles cases in which courts have held that a work environment was not hostile. In *Harris*, for example, the Eleventh Circuit held that a workplace was not hostile when a supervisor made one "highly offensive comment," micromanaged the employee, asked coworkers to report violations by the employee, and ignored the employee's discrimination complaints. 82 F.4th at 1305. Similarly, here, the blackface doll could be seen as one "highly offensive" incident, while the two comments by Boutwell were at worst, slightly objectionable behavior. This case is also like *Yelling*, in which the Eleventh Circuit held that a workplace was not hostile even though coworkers made comments about President Obama, Confederate flags, and racial epithets. 82 F.4th at 1335-337. Here, the blackface doll could be viewed as equivalent to racial epithets, while Boutwell's alleged remarks could resemble the comments about President Obama.

In contrast, this case is unlike those in which courts have found a hostile work environment, such as *Adams v. Austal, U.S.A., L.L.C.* In *Adams*, the Eleventh Circuit held that a workplace was hostile when a Black employee encountered two nooses in the workplace, heard other Black employees called "boy" and "monkey," witnessed a coworker kick another Black employee and wear Confederate flags every day, and heard her supervisor describe a racist, lewd drawing of her. 754 F.3d at 1251. Here, even though the blackface doll was hanging by what appeared to be a noose at Plaintiff's desk, it was a single incident and was not accompanied by the other severe and patently offensive behavior as seen in *Adams*. The two comments by Boutwell were isolated, made outside of Plaintiff's presence, and were not obviously racist, and there is no indication they were about her.

Plaintiff has failed to demonstrate a dispute of material fact as to whether these three incidents could constitute a hostile work environment.

For these reasons, Defendants are entitled to summary judgment on Plaintiff's claims in Count IV.

### D.    Retaliation under Title VII (Count I) and 42 U.S.C. § 1981 (Count V)

In Count V, Plaintiff alleges that her termination represented unlawful retaliation under § 1981, and she also appears to allege such a claim pursuant to her Title VII claim of "wrongful termination" in Count I. (Doc. # 46 ¶¶ 94, 205-59). Title VII prohibits an employer from firing an employee in retaliation for opposing or complaining about an unlawful employment practice such as racial discrimination. 42 U.S.C. § 2000e-3(a). A *McDonnell Douglas* framework can be used to evaluate a Title VII or § 1981 retaliation claim. *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1344-45 (11th Cir 2022).

After careful review, the court concludes that Defendants are entitled to summary judgment on both claims. First, Title VII does not allow for individual liability. Second, Plaintiff has not established a prima facie case of retaliation under *McDonnell Douglas*. Finally, even if she had established a prima facie case, Plaintiff has not shown that DCH's explanation for her termination was pretextual.

### 1.    Individual Liability Under Title VII

As already explained in assessing Plaintiff's discrimination claim in Count I above, the individual Defendants – Ellison, Boutwell, and Wingo – are entitled to summary judgment on the retaliation claim because Title VII does not give rise to individual liability. *See Dearth*, 441 F.3d at 933. Plaintiff concedes this. (Doc. # 69 at 11-12). Therefore, the individual Defendants are due to be dismissed as to Plaintiff's retaliation claim in Count I.

Plaintiff's retaliation claim against DCH fares no better, but for different reasons.

### 2.    Prima Facie Retaliation Claim

To make out a prima facie case of retaliation, a Plaintiff must show: "(1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Patterson*, 38 F.4th at 1344-45 (11th Cir 2022) (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020)). Section 1981 also permits retaliation claims, provided the basis of the claim relates to race. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445-46 (2008). "A [retaliation] claim brought under 42 U.S.C. § 1981 is analyzed under the same framework as a Title VII claim because both statutes have the same requirements of proof." *Wilson v. Farley*, 203 F. App'x 239, 247 (11th Cir. 2006) (citing *Standard v. ABEL Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

### a.    Statutorily Protected Activity

Plaintiff argues that she engaged in statutorily protected activity on two occasions: when she filed her 2014 EEOC charge (Docs. # 46 ¶ 8; 65-5 at 88), and when she sent the April 3, 2020 email complaining of harassment, discrimination, and retaliation. (Docs. # 46 ¶ 186; 65-5 at 142). Upon review, the court concludes that the only protected conduct that Plaintiff alleges is the 2014 EEOC charge.[8]

Statutorily protected expression under Title VII includes where an employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). These clauses are known as the "opposition clause" and the "participation clause." *See Crawford v. Metro. Gov. of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009).

Defendants concede that the 2014 EEOC charge was statutorily protected conduct. The court agrees. (Docs. # 61 at 28; 64 at 26-29). However, Defendants dispute that the April 3, 2020 email was statutorily protected expression. (Docs. # 61 at 27; 64 at 27). They argue that it is merely a complaint "about being singled out, being subjected to a campaign of harassment, and working in a hostile environment," but that it does "not suggest that the treatment is related to a protected characteristic." (Docs. # 61 at 27; 64 at 27-28).

Once again, the 2020 email stated:

I am writing to request that management cease all forms of retaliation and discrimination against me. On several occasions, I have been retaliated against by management. It has been a continuation of continued harassment and retaliation

---

[8] Plaintiff also argues in her summary judgment briefing that she engaged in protected conduct by reporting a co-worker's non-compliance with DCH's policy. (Docs. # 68 at 27; 69 at 30). But, "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour*, 382 F.3d at 1315. Further, even if the court allowed Plaintiff to do this, the co-worker's non-compliance was with the company's dress code, not with Title VII or § 1981. (Doc. # 71-1 at 39-40). Therefore, it is not statutorily protected conduct.

> that I have been subjected to for several years. My qualifications and demonstrated commitment to this organization has been me[t] with retaliation and discrimination. I have been denied Promotions and treated inferior than others, which is against company policy. Again, I am requesting that I not be singled out and treated differently in the future based on discrimination and retaliation.

(Doc. # 65-5 at 142).

Plaintiff's 2020 email certainly was not "participation" under the participation clause because it was not "in conjunction with or after the filing of a formal charge with the EEOC." *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citing *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)). Nor was Plaintiff's 2020 email "opposition." It did not reference unlawful employment discrimination either explicitly or implicitly. "A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (citing EEOC Comp. Man. (CCH) §§ 8-11-B(2) (2006)). Employment discrimination is *unlawful* under Title VII if it is based on a characteristic that Title VII protects, such as race. If a plaintiff's complaint does not suggest that the complained-of treatment "was in any way related to [] race," then it is not protected activity. *Jeronimus v. Polk Cnty. Opportunity Council, Inc.*, 145 F. App'x 319, 326 (11th Cir. 2005). Under this legal standard, Plaintiff's 2020 email, which does not reference race, was not protected activity.

### b.    Adverse Action

"Termination is a materially adverse action." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). Plaintiff has easily satisfied this element.

Plaintiff also argues in her summary judgment briefing that another adverse action occurred when she was "relocated to a smaller working space in a more secluded area." (Doc. # 68 at 28).

But, Plaintiff has not clarified when she was relocated to a smaller working space. (Doc. # 71-1 at 40).

In the retaliation context, an adverse employment action is "an action that 'produces an injury or harm' and would dissuade a reasonable worker from engaging in protected conduct." *Hitt v. CSX Transportation, Inc.*, 672 F. Supp. 3d 1192, 1201 (N.D. Ala. 2023 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006)). Plaintiff does not allege that there were any changes in her employment status, responsibilities, or benefits due to her relocation. In fact, when asked whether there was "anything negative about that floor," Plaintiff responded, "I made it work for me," and explained that "[o]ne of the doctors gave me a refrigerator and I had a good little work area." (Doc. # 62-2 at 41). However, the Eleventh Circuit has held that an adverse employment action can include a failure to promote or transfer an employee until after the resolution of his EEOC charge. *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 782 (11th Cir. 2024). Although a failure to transfer or promote is not identical to a change in office location, resolving all justifiable inferences in favor of Plaintiff, the court concludes that moving an employee to a new work area apart from her coworkers "well might have dissuaded" a reasonable employee from reporting discriminatory conduct. Therefore, it was an adverse employment action.

Assuming each event – her discharge and her relocation – are adverse actions, the question is whether they are causally related to protected activity.

### c.    Causally Related

Generally, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact about a causal connection." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Where temporal proximity is the *only* evidence of causation, that proximity

must be "very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). As the Eleventh Circuit has held, an adverse employment action that occurs within one month of the protected activity satisfies the causation requirement for summary judgment purposes. *See Summers v. City of Dothan*, 444 F. App'x 346, 351 (11th Cir. 2011); *Donnello v. Frehauf Corp.*, 794 F.2d 598, 601-02 (11th Cir. 1986). In contrast, standing alone, a gap of two months or longer between the two events has been found to be insufficient to infer causation. *See Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229-30 (11th Cir. 2011) (holding that a two-month gap is not "very close"); *Thomas*, 506 at 1364 (finding that a period of three months was too long to create an inference of causation).

The gap between Plaintiff's 2014 EEOC charge and her termination on November 25, 2020, is approximately six years. (Doc. # 65-5 at 98). And, even if Plaintiff's April 3, 2020 email constituted protected conduct (which, to be clear, it does not), Plaintiff sent that email over seven months before her termination. If a gap of two or three months is too long to justify an inference of causation, then a gap of six years or seven months is, too.

Regarding the adverse employment action of moving Plaintiff's work area, there is no evidence in the Rule 56 record as to *when* Plaintiff's work area was moved, which makes it impossible for the court to evaluate whether there was temporal proximity between her 2014 EEOC charge and the workplace move. Additionally, in describing that move, Plaintiff does nothing to causally connect it to the 2014 EEOC charge (or even to the April 3, 2020 email). (*See* Doc. # 71-1 at 40-41 (testifying about the new work area immediately after discussing the dress code incident)).

For these reasons, Plaintiff has not established a prima facie case for retaliation.

### 3. Rebutting Legitimate, Non-Retaliatory Reason as Pretextual

Even if Plaintiff had established a prima facie case for retaliation (and, to be clear, she has not), she has not sufficiently rebutted Defendants' non-retaliatory reason as pretextual. Defendants proffer the following legitimate, non-retaliatory reason for Plaintiff's termination: "Plaintiff failed to comply with DCH's 2020 flu vaccine policy, and DCH terminated Plaintiff's employment pursuant to that policy." (Docs. # 61 at 29; 64 at 29). The court has already concluded that this was a legitimate reason for Plaintiff's discharge in its analysis of her discrimination claim. For the same reasons, it is a legitimate explanation in the context of retaliation as well. Therefore, the burden shifts to Plaintiff to rebut this reason as pretextual.

Again, Plaintiff has not rebutted Defendants' reason for her termination. Her argument is brief: "A reasonable jury could find that Defendant's actions were motivated by retaliation, not legitimate business reasons." (Docs. # 68 at 29; 69 at 32). It is also unavailing. This is a conclusion – not an argument. Additionally, "[a] plaintiff cannot rebut a reason 'by simply quarreling with the wisdom of that reason' or substituting her 'business judgment for that of the employer.'" *Patterson*, 38 F.4th at 1353 (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)). Plaintiff has, therefore, not carried her burden of rebutting Defendants' legitimate, non-retaliatory reason.

For these reasons, Defendants are entitled to summary judgment on Plaintiff's retaliation claims in Counts I and V.

### E. Defamation or Slander Per Quod (Count VI)

Plaintiff alleges that Defendants defamed her when they "falsely, wrongfully, negligently, recklessly, wantonly and unskillfully communicated to third persons[] that Plaintiff[] had failed to provide the appropriate documentation to support her exemption request for the flu vaccine." (Doc.

35

# 46 ¶ 261). Plaintiff has conceded that the individual Defendants are entitled to summary judgment on Count VI, so the court considers this claim only against DCH. (Doc. # 69 at 32-33).

In Alabama, the elements of a defamation claim are:

1) a false *and* defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*McCaig v. Talladega Publ'g Co.*, 544 So. 2d 875, 877 (Ala. 1989). "Truth is an absolute defense to defamation . . . ." *Foley v. State Farm Fire & Cas. Ins. Co.*, 491 So. 2d 934, 937 (Ala. 1986).

Plaintiff has identified five alleged defamatory statements. The first one was between Ellison and either Boutwell or Posey that "'she' (Plaintiff) was not in compliance for whatever reason they [F.E.; R.B. and C.W.] 'so declared.'" (Doc. # 62-18 at 3). Plaintiff also stated that the statement "was made to: [the EEOC] & [the State of Alabama Department of Labor]," and that it was untrue because the rejection of this request "was not due to the 'lack of specificity' of the request." (*Id.*). The second, third, fourth, and fifth statements were all statements made to the EEOC or the Alabama Department of Labor. (*Id.* at 2-4).

The first statement is not defamatory because it is true. *Foley*, 491 So. 2d at 937. As discussed above, Plaintiff was not in compliance with the DCH flu vaccine policy. Further, even if the statement were untrue, this statement was not published. Under Alabama law, "[c]ommunications among the managerial personnel of a corporation about the company's business do not constitute a publication." *K-Mart Corp. v. Pendergrass*, 494 So. 2d 600, 603 (Ala. 1986) (cleaned up). Ellison, Boutwell, and Posey were all managerial personnel (Docs. # 64 ¶ 2; 69 ¶ 2; 65-5 at 17), and they were discussing "the company's business" – that is, Plaintiff's noncompliance with DCH vaccine requirements. To the extent that the first statement was made

36

to the EEOC and the Alabama Department of Labor, it was also not defamatory because, like the other four statements, it is protected by absolute privilege under Alabama law.

Alabama law confers an absolute privilege over communications "made in the course of legislative or judicial proceedings." *O'Barr v. Feist*, 296 So. 2d 152, 156 (Ala. 1974). This absolute privilege extends to quasi-judicial proceedings. *Webster v. Byrd*, 494 So. 2d 31, 34 (Ala. 1986). The EEOC was functioning in a quasi-judicial capacity when investigating Plaintiff's EEOC charge, and therefore any statements made in connection with this investigation are privileged.

Although Alabama caselaw classifies other entities as quasi-judicial,[9] the court can find no Supreme Court of Alabama decision addressing whether proceedings before the EEOC are quasi-judicial. To be sure, the Eleventh Circuit has weighed in on this question, albeit in an unpublished decision. That panel described an EEOC investigation of a discrimination charge as quasi-judicial. *Mack v. Delta Air Lines, Inc.*, 639 F. App'x 582, 586 (11th Cir. 2016). Another district court in this circuit has reached the same decision: "the court concludes that Alabama's absolute privilege extends to statements that were made in connection with, and were relevant to, the administrative proceedings before the EEOC . . . because such proceedings were 'quasi-judicial.'" *Redmon v. Auto*, 2014 WL 4855023, at *6 (M.D. Ala. Sept. 29, 2014). Consistent with these rulings, the court holds that the EEOC's investigation of Plaintiff's charge was quasi-judicial; therefore, Defendants' statements to the EEOC – specifically, the first, second, third, and fourth statements – are all privileged.

---

[9] The Supreme Court of Alabama has held that the following proceedings are quasi-judicial: a hearing before the Alabama Board of Pardons and Paroles, *Sullivan*, 925 So. 2d at 976, a disciplinary action by the State Board of Chiropractic Examiners, *Mooneyham v. State Bd. of Chiropractic Examiners*, 802 So. 2d 200, 206 (Ala. 2001), a hearing before the State Tenure Commission, *State Tenure Comm'n v. Madison Cnty. Bd. of Educ.*, 213 So. 2d 823, 834 (Ala. 1968), a liquor license approval by a Board of Commissioners, *Ott v. Everett*, 420 So. 2d 258, 261 (Ala. 1982), and a decision by the Alabama Public Service Commission, *Glen McClendon Trucking Co. v. Hall Motor Exp., Inc.*, 229 So. 2d 488, 493 (Ala. 1969).

The first and fifth statements are similarly privileged because Alabama law confers an absolute privilege to statements from an employer to the Alabama Department of Labor in connection with the administration of unemployment compensation laws. Ala. Code § 25-4-116 (stating that all communications "from employer or employee . . . to the secretary . . . or to any official or board functioning under this chapter . . . in connection with the requirements and administration of this chapter, shall be absolutely privileged").

For these reasons, Defendants are entitled to summary judgment on Plaintiff's claims in Count VI.

## IV.   Conclusion

For the reasons discussed above, DCH's Motion for Summary Judgment (Doc. # 60) is due to be granted and Defendants Ellison, Boutwell, and Wingo's Motion for Summary Judgment (Doc. # 63) is due to be granted. The court will enter an Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this May 21, 2025.

R. DAVID PROCTOR
CHIEF U.S. DISTRICT JUDGE